### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

PAMELA BANKS,

     Plaintiff,

     v.                            Case No. 15-CV-2602-JAR

ST. FRANCIS HEALTH CENTER, INC.,

     Defendant.

### MEMORANDUM AND ORDER

Plaintiff Pamela Banks brings this action against Defendant St. Francis Health Center, Inc. ("St. Francis") alleging a claim of race discrimination and harassment under Title VII of the Civil Rights Act of 1964[1] and § 1981 of the Civil Rights Act of 1866.[2] The Court previously dismissed Plaintiff's claims of retaliation and interference with contractual relations.[3]

Before the Court are Defendant's two Motions to Dismiss (Doc. 120 and 130) and Defendant's Motion for Summary Judgment (Doc. 127). The Motions to Dismiss are identical, but the first Motion to Dismiss (Doc. 120), which is not briefed, is moot. The second Motion to Dismiss (Doc. 130) and the Motion for Summary Judgment (Doc. 127) are fully briefed, and the Court is prepared to rule. For the reasons explained in detail below, the Court denies Defendant's motion to dismiss, and grants Defendant's motion for summary judgment.

---

[1] 42 U.S.C. §§ 2000e–2000e-17.

[2] 42 U.S.C. § 1981.

[3] Doc. 96.

## I.       Motion to Dismiss

### A.       Plaintiff Allegedly Provided Willfully False Testimony

Defendant moves to dismiss Plaintiff's claims as a sanction pursuant to Fed. R. Civ. P. 37 and D. Kan. Rule 11.1(a)(2), for allegedly providing false testimony that caused Defendant considerable expense and delay and has interfered with the judicial process. Defendant alleges that Plaintiff falsely testified about three subjects: (1) her criminal history; (2) her litigation history; and (3) her applications for other positions with Conifer.

First, Defendant alleges that Plaintiff falsely testified about her criminal convictions for fraud and perjury.  Certified copies of the records of the Circuit Court of Cook County, Illinois show that Plaintiff was indicted, arrested, released on bond, found guilty of both benefits fraud and perjury, and sentenced to thirty months of probation and payment of restitution of $4,048.00. Defendant cites Plaintiff's interrogatory responses and deposition testimony where she denied any prior criminal arrests, charges, or convictions.  When confronted with the dockets for the charges during deposition, Plaintiff claimed that the charges were dismissed.  Plaintiff responds that she made an honest mistake about the disposition of the charges.  She had merely received a document containing the information on the charges through certified mail.  She was never arrested.  She hired an attorney to handle the matter, and she believed that the charges were dismissed and off her record.

Second, Defendant alleges that Plaintiff falsely testified about her litigation history. Defendant claims that court records in Cook County, Illinois, and Shawnee County, Kansas revealed that Plaintiff was a defendant in more than twenty different lawsuits and that Plaintiff's Schedule F to her 2005 Bankruptcy Petition confirms she had several collection actions filed against her.  But in her answers to interrogatories, Plaintiff denied ever having a lawsuit filed

against her.  And Defendant claims that when Plaintiff was deposed about specific suits, she denied knowledge of the suits or stated they were in error.

Plaintiff responds that the court records of the lawsuits, as well as the 2005 bankruptcy petition pertained to a different Pamela Banks, not her.  And Plaintiff suggested this to Defendant during her deposition, noting that the social security number on the bankruptcy petition was not her social security number.[4]

Third, Defendant alleges that Plaintiff did not testify truthfully during her deposition about her desire to remain as a patient advocate with Defendant, nor her efforts to find a new position with Conifer Revenue Cycle Solutions, Inc. ("Conifer").[5] Plaintiff denies testifying falsely, in that she did not want to be out of the patient advocate position she held with Defendant, and in that Conifer transferred her to a "less desirable" position in accounting in Boca Raton, Florida.

### B.    Legal Standard

A district court has inherent equitable powers to impose the sanction of dismissal with prejudice for abusive litigation practices during discovery.[6]  Because dismissal is a harsh remedy, due process requires that the violation be predicated upon willfulness, bad faith, or fault of the petitioner rather than inability to comply.[7]  In many cases, a lesser sanction than dismissal will deter the errant party from further misconduct.[8]  In determining what sanction should be

---

[4] In its reply, Defendant has offered a Bankruptcy Petition from 2012 matching the social security number of Plaintiff.  There is one collections suit listed on that petition that Plaintiff denied involvement in because it was filed against her husband.

[5] Conifer was Plaintiff's employer and a contractor with Defendant for patient advocate services.

[6] *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1179 (10th Cir. 2009); Fed. R. Civ. P. 37(b)(2).

[7] *Archibeque v. Atchison, Topeka & Santa Fe Ry. Co.*, 70 F.3d 1172, 1174 (10th Cir. 1995).

[8] *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992).

imposed, it is most important that the court consider the purposes to be served by imposing that sanction.[9]

Before choosing dismissal as a sanction, the Tenth Circuit suggests that district courts evaluate five factors: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanction.[10]

### C.    Discussion

Considering all relevant factors, the Court finds that dismissal of Plaintiff's claims is not an appropriate sanction.  First, there is very little actual prejudice to Defendant based on the alleged false testimony.  Defendant argues that it has incurred substantial expenses in terms of time and money to verify Plaintiff's discovery responses, including obtaining certified copies of Plaintiff's criminal convictions and issuing a subpoena to Conifer to obtain Plaintiff's personnel file and documents regarding Plaintiff's interest in obtaining another position.  But, as Plaintiff posits, Defendant was aware of Plaintiff's convictions before her deposition, and simply needed to obtain certified copies of the court records to determine the veracity of Plaintiff's statements about her convictions.  Moreover, this is not the type of prejudice that affected Defendant's ability to litigate the matter, as this pertains to impeachment evidence, not evidence concerning the claims at issue.

---

[9] *Quinn v. City of Kansas City, Kan.*, 64 F. Supp. 2d 1084, 1094 (D. Kan. 1999).  The Tenth Circuit has outlined a number of purposes for imposition of a particular sanction to include (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management.  *White v. Gen. Motors Corp.*, 908 F.2d 675, 683 (10th Cir. 1990).

[10] *Ehrenhaus*, 965 F.2d at 920–21.

Further, Defendant mistakenly attributed lawsuits and a 2005 bankruptcy filing to Plaintiff; she did not testify falsely in denying knowledge of or involvement in this litigation. Further, with respect to Plaintiff's 2012 bankruptcy filing and its listing on one collection action, Plaintiff did not falsely testify.  She acknowledged the existence of the collections action but explained that it was filed against her husband.   Moreover, to the extent that Plaintiff did not fully and completely testify about this action, Defendant has not suffered the type of prejudice that affected Defendant's ability to litigate.  Again, this is impeachment evidence.

Lastly, Plaintiff did not falsely deny that she had sought transfers or applied for other positions with Conifer.  She admitted this in her deposition testimony.  To be sure, Plaintiff did not identify each position that she applied for or sought transfers to, but there is no indication that she willfully omitted this detail from her testimony.  And, Defendant suffered no prejudice, because Defendant knew, based on Plaintiff's deposition testimony, that Plaintiff had sought multiple other positions within Conifer, which was relevant to litigate the claims going forward. In short, given that Defendant had evidence contradicting much of the alleged false testimony prior to deposing Plaintiff and sought confirmation of the testimony after deposing Plaintiff, Defendant did not rely to its detriment and has suffered only minimal prejudice, if any.

Second, there has been no more than minimal interference with the judicial process. Plaintiff's deposition testimony prompted both Defendant and Plaintiff to subpoena documents from Conifer in October 2015 to confirm the exact positions for which Plaintiff had applied. While this resulted in an extension of the discovery period, neither party had control over Conifer's timely response to the subpoenas, as Conifer is not a party to this action.  Furthermore, Defendant issued another subpoena to Conifer regarding La'Sherrez Clark in February 2016, months after the subpoena complained of here.  Discovery could not close until Conifer

produced documents to both Plaintiff and Defendant, so there was no interference with the judicial process.

Third, although Defendant suffered minimal prejudice from Plaintiff's false testimony about her convictions, there is little indication that Plaintiff is culpable for the alleged false testimony.  Plaintiff had a reasonable explanation for her testimony about the disposition of her perjury and fraud conviction.  These twenty-three-year-old convictions resulted in a sentence of probation and restitution.  Plaintiff was never taken into custody or handcuffed, and she was notified of the charges by certified mail.  She insisted during her deposition that she believed the charges had been dismissed and had not resulted in a finding of guilty.  It is likely that Plaintiff misunderstood the disposition of the charges, believing that the charges were dismissed or expunged.

And, with respect to Plaintiff's litigation history, there is no indication that she testified falsely at all.  Plaintiff admitted to the only proven collections suit brought against her and explained that she understood that the action was actually instituted against her husband.  Given that Plaintiff was questioned based on a bankruptcy schedule that was not hers, the Court is not convinced she is culpable for any alleged false testimony.  Lastly, in her deposition testimony, Plaintiff admitted that she sought transfer and other positions within Conifer.  While she was not completely forthcoming about all of the positions she applied for, she did admit to the basic underlying fact of seeking transfer and/or other positions.  None of the alleged false testimony Defendant has pointed to appears to be intentionally deceptive.

Fourth, the Court was not apprised of the alleged false testimony until Defendant's motion to dismiss.  Therefore, the Court issued no advance warnings threatening dismissal.

Fifth, lesser sanctions are more efficacious in this case. Dismissal of an action or its equivalent should be used as "a weapon of last, rather than first, resort."[11] The testimony at issue was either not false, or only minimally prejudicial to Defendant's development of primarily impeachment evidence. There is no indication that Defendant detrimentally relied on Plaintiff's testimony. In fact, Defendant had evidence of Plaintiff's convictions and litigation history before deposing her; and Defendant immediately subpoenaed Plaintiff's employer, Conifer, to confirm her deposition testimony about seeking other positions. While there were undoubtedly costs associated with the subpoena and obtaining certified records of Plaintiff's conviction, Defendant has not moved the Court for costs–a lesser sanction that Defendant did not ask for– even in the alternative.

Given that there was little actual prejudice to Defendant, little interference with judicial process, no Plaintiff culpability, no advanced warning by the Court, and a lesser sanction available, the Court denies Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 37 and D. Kan. Rule 11.1(a).

## II.     Motion for Summary Judgment

Plaintiff's remaining claims allege that Defendant discriminated against her on account of her race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Defendant asserts that it is entitled to summary judgment on Plaintiff's claims because (1) Plaintiff's claims have been released by the Termination Agreement and (2) Plaintiff cannot establish an underlying employment relationship with Defendant. The Court will address each argument in turn.

---

[11] *Meade v. Grubbs*, 841 F.2d 1512, 1520 n.6 (10th Cir. 1988); *Maggette v. Dalsheim*, 709 F.2d 800, 803 (2d Cir. 1983).

As an initial matter, Defendant also argues, out of an abundance of caution, that is it entitled to summary judgment on any remaining claims of retaliation and constructive discharge. While the Pretrial Order[12] references Plaintiff's retaliation claim in Count I of the Complaint, no such claim remains.  This Court dismissed Plaintiff's claim(s) of retaliation and constructive discharge in its March 31, 2016 order[13] granting Defendant's motion to dismiss Count II (retaliation in violation of Title VII and §1981) and Count III (contractual interference in violation of §1981).

Perhaps the confusion arises from the inartful drafting in Plaintiff's complaint.  Count II claimed retaliation.  Count I claimed discrimination and harassment.  Although the heading of Count I also included the word "retaliation," the body of Count I made no mention of a retaliation claim.  This Court's order dismissing Plaintiff's retaliation claim in Count II effectively dismissed any such claim of retaliation in Count I.  But, importantly, Count I did not state a claim of retaliation.  Indeed, the Court subsequently denied Plaintiff's motion to file an amended complaint to *add* another claim of retaliation.  And, with respect to constructive discharge, this Court's order granted Defendant's motion to dismiss on that claim as well, with respect to Count I and Count II.   Plaintiff's attempt at a second bite of the apple now is unavailing.

A.      **Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[14]  In

---

[12] Doc. 119.  Magistrate Judge Teresa James noted in the Pretrial Order that "The Court's March 31, 2016 Order Dismissed Count II [retaliation in violation of Title VII] but did not address the retaliation claims outlined in Count I.  While I assume the same logic applies, out of an abundance of caution . . I am laying out the elements for each count as provided in the Second Amended Complaint." *Id.* at 8 n.1.

[13] Doc. 96.

[14] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[15]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[16]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[17]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[18]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[19]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence regarding an essential element of the other party's claim.[20]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[21]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[22]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[15] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[16] *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[17] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 2004)).

[18] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (internal quotations omitted).

[19] *Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[20] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2002) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[22] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[23]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[24]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[25] The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[26]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[27]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[28]

## B.    Uncontroverted Facts

At the outset, the Court notes that many of the recitations of facts by both parties are immaterial to the resolution of the summary judgment motion.  The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

In 2009, Defendant's parent company, Sisters of Charity Leavenworth Health Systems ("SCLHS"), Inc., entered into a Master Services Agreement ("MSA") with Conifer Revenue Cycle Solutions ("Conifer").  Conifer agreed in the MSA to provide services to SCLHS

---

[23] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[24] *Adams*, 233 F.3d at 1246.

[25] Fed. R. Civ. P. 56(c)(4).

[26] Fed. R. Civ. P. 56(c)(1); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted); *see also Celotex*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses").

[27] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[28] *Conway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

constituent hospitals, including to Defendant located in Topeka, Kansas.  One of the services the MSA required Conifer to provide to constituent hospitals was medical eligibility counseling services ("MECS"), which means aiding self-pay patients in determining whether they are eligible for government programs.[29]  The MSA required Conifer to provide qualified personnel to perform the contractually required services in a timely, workmanlike, and professional manner.

Pursuant to the MSA, Conifer agreed that the personnel supplied to perform services would follow SCLHS constituent hospital's personnel and administrative policies and procedures and code of conduct.  Conifer further agreed it would take reasonable steps to assure that its employees would be familiar with constituent hospital's code of conduct, and within five days of hire or subcontracting, Conifer employees were required to sign a statement of agreement to comply with constituent hospital's code of conduct and relevant policies.  However, the MSA also directed that Conifer personnel would be subject to Conifer human resource policies and required to comply with Conifer's conflict of interest, business relationship, and protection of assets policies.

Constituent hospitals, like St. Francis, were obligated in the MSA to provide access and training on appropriate systems to Conifer personnel like they would their own employees.  The MSA also required that constituent hospitals provide Conifer personnel assigned to work on the premises "a reasonable work environment, including office space, furniture, supplies, and equipment" to enable them to perform.

Pursuant to the MSA, in 2011, Conifer posted a requisition for a patient advocate position at St. Francis in Topeka, Kansas.  The patient advocate position helped Conifer provide the

---

[29] The Court sustains Plaintiff's objection to Defendant offering a news release regarding Conifer providing MECS.  This was not produced in discovery, and it is also hearsay.  However, Plaintiff concedes that the MSA states that Conifer would provide MECS to Defendant and other identified hospitals.

MECS role to Defendant to fulfill its obligation under the MSA.  The requisition stated that the job was full time.  The requisition also stated that Monica Harris, a Conifer MECS Director, was the hiring manager and Lori Kelim, a Conifer employee, was the "person this position reports to."  Plaintiff applied for the patient advocate position through Conifer, not Defendant.  Plaintiff interviewed with Harris.  Defendant did not interview Plaintiff.[30]

On December 19, 2011, Conifer sent Plaintiff a letter offering her "employment with Conifer Revenue Cycle Solutions, Inc. as a Patient Advocate at St. Francis Health Center."  Conifer included Plaintiff's compensation in the letter.  Conifer offered Plaintiff its standard employee benefits.  Finally, Conifer stated in the letter that Plaintiff's employment "with Conifer will be on an at-will basis, which means that either you or the company may terminate the employment relationship, with or without notice and with or without cause at any time."[31]  Plaintiff signed the letter, which obligated her to abide by all Conifer Human Resource and other policies, procedures, rules, and regulations.

Once hired by Conifer in January 2012, Conifer provided Plaintiff and La'Sherrez Clark, the other Conifer personnel hired for placement at the hospital, orientation in Kansas City.  There were no new St. Francis employees present.  Following Conifer's orientation, Defendant provided Plaintiff with training on electronic record keeping systems.  Defendant's human

---

[30] The Court does not include in the uncontroverted facts Plaintiff's allegation that she interviewed at St. Francis for the position.  This is not supported by proper evidence because allegations in the complaint are not evidence for the purpose of summary judgment.  *See Nanho-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (noting that the non-movant may not rely merely on its own pleadings); *Tavery v. United States*, 32 F.3d 1423, 1431 (10th Cir. 1994) (concluding that the proponent of evidence must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file'") (citing *Celotex*, 477 U.S. at 324 (1986) (quoting Rule 56(e)).

[31] The Court does not include in the uncontroverted facts Plaintiff's allegation that Barb Shields could say that she no longer wanted Clark or Plaintiff as patient advocates.  This statement was allegedly made by Shields to Kelim and then told to Plaintiff, which is hearsay.  Plaintiff testified that she did not know if Shields actually told Kelim this, so it is also mere speculation.

resources also provided a general orientation for Plaintiff and Clark, which included training on Defendant's policies and procedures.

Once on site at the hospital, Conifer provided Plaintiff a laptop, an email account, docking station, printer, and copier.  Defendant provided Plaintiff a desktop computer, a desk phone, an email address, and office space.  The desktop Defendant provided was the main computer Plaintiff used.  If there was ever a supply that Plaintiff or Clark needed, Defendant provided it pursuant to the MSA requirement that constituent hospitals provide supplies to on site personnel.

Defendant also gave Plaintiff a photo identification badge with her name and department, patient access.  Plaintiff's badge had the names St. Francis and SCLHS on it, but it did not have the name Conifer on it.  Plaintiff's badge had a red background, which was a different color than Defendant's employees.[32]

Conifer set Plaintiff's pay rate.  Conifer paid Plaintiff's compensation and her employment taxes.  Conifer provided Plaintiff's benefits, including medical, dental, and vision insurance as well as Education Assistance Reimbursement.  During Plaintiff's time at Defendant, Defendant did not pay Plaintiff's compensation, nor did Defendant provide benefits to Plaintiff other than allowing her to use her badge in Defendant's cafeteria.[33]

---

[32] Plaintiff did not properly controvert the fact that the badge was red while Defendant's employee badges were a different color.  Plaintiff offered testimony from her and Clark that they did not know if their badges were a different color than Defendant's employees, which does not contradict Shield's testimony that contractors had different color badges.

[33] The Court overrules Defendant's objection that referencing the content of Defendant's employee handbook violates Fed. R. Evid. 1002 (also known as "the best evidence rule") and the rule against hearsay.  This does not violate the best evidence rule because "at the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial."  *Francoeur v. U.S. Bank Nat'l Ass'n*, 643 F. App'x 701, 704 (10th Cir. 2016) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).  The contents of the handbook were based on personal knowledge, and Defendant has offered that the content can be proven through the handbook provided online.  This is also not hearsay because the handbook is a statement of a party opponent and a business record.  Fed. R. Evid. 801(d)(2), 803(6).

Plaintiff and Clark were considered part of Defendant's patient access department, which was Barb Shields' department. Barb Shields' title was Patient Access Supervisor. Shields trained Plaintiff and Clark on documenting patient accounts. Shields also provided patient access trainings for the department, which Plaintiff and Clark attended. Shields gave Plaintiff daily assignments by way of a patient census, which directed Plaintiff on the patients she needed to see for the day. Kelim acknowledged in an email to Harris that she could not "believe the control [Shields] insists on having over everything." For example, Shields told Plaintiff and Clark that they could not contact environmental services or anyone else in the hospital without going through her.

Conifer did not have a supervisor on site at St. Francis, but Kelim visited once every two to three months. On one of her visits, Kelim told Plaintiff, "St. Francis is our employer and you must abide by their daily standards, work ethics, whatever Barb Shields asks of you, you must comply." Even though Kelim was not on site every day, Plaintiff contacted Kelim when Plaintiff had a procedural question, such as how to handle observation patients.

Plaintiff was required to follow a number of Defendant's policies pursuant to the MSA. This included following Defendant's dress code. She also had to seek prior approval to accept part-time work.[34] She was required to tell patients that she was a patient advocate for St. Francis upon entering their room.

Plaintiff was assigned to visit all of the patients who were treated in the emergency room. This was not initially part of the patient advocate job duty. Shields testified that she discussed this with Conifer, and Harris informed Plaintiff that she would be covering the emergency room. Plaintiff and Clark also worked on COBRA accounts, which was not initially part of the patient

---

[34] Again, the Court overrules Defendant's objection that mentioning the content of the employee handbook violates the best evidence rule. *See supra* note 33.

advocate job duties.  Clark called Kelim about working on COBRA accounts based on Shield's request.  Kelim decided that Clark and Plaintiff should go ahead with the work.  Shields required Clark to provide Shield's brother help applying for government programs.  Clark raised the issue with Conifer, and Conifer decided she should do it.  Clark testified that she always performed tasks requested by Shields because she said, "I'm your supervisor while you're here."[35] However, if Shields made a request outside of the patient advocate position duties, Clark testified she contacted Conifer, and Conifer decided if she should complete the task.

Plaintiff and Clark worked beyond their scheduled hours if Shields requested that they stay to get the job done.  However, Clark testified that Kelim and Harris were in agreement that she should stay if the job needed to get done.  Shields required Plaintiff and Clark to email her if they had to leave the office to go visit a patient when they otherwise would be in the office. Clark testified she sent these emails to both St. Francis and her Conifer supervisor.

When Plaintiff or Clark wanted time off, they informed Kelim who informed Defendant. Conifer's holiday schedule governed the days that Plaintiff and Clark could take off.  However, Shields could require one of the women to come in when it left Defendant without someone to perform MECS role on holidays that St. Francis did not have off.

Defendant required Plaintiff and Clark to attend meetings for the electronic record keeping system.  Defendant (through Shields) required Plaintiff and Clark to attend weekly meetings with the social workers, but Conifer requested they stop attending.  Conifer stood by

---

[35] The Court overrules Defendant's objection that this is a conclusory statement and not proper evidence. This is a party admission that is being offered as evidence, not a legal conclusion.  The Court also overrules the objection to hearsay as this is a statement of a party opponent as Shields worked for Defendant and made this statement within the scope of her employment.  Fed. R. Evid. 801(d)(2)(D) ("The statement is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").

this decision even over Shields' objection.  Defendant also required Plaintiff and Clark to attend a diversity meeting even though they attended one with Conifer.

Conifer performed Plaintiff's annual performance reviews.  Defendant did not perform yearly performance reviews of Plaintiff.  Defendant performed quarterly performance appraisals, which included general statistics about Plaintiff and Clark's numbers while at St. Francis.  The same quarterly performance appraisal covered both Clark and Plaintiff.  Defendant also provided weekly key performance indicator reports to Conifer, which included statistics.  Conifer maintained Plaintiff's personnel file.  Defendant maintained a file on Plaintiff in human resources, which included several signed acknowledgements by Plaintiff. [36]

When a complaint was made by a St. Francis patient's caregiver to Defendant about Plaintiff, Shields did not approach Plaintiff, but instead passed the complaint to Conifer.  Clark testified that Shields wrote up a summary of the events that was shown to her.[37]  Conifer investigated the caregiver's complaint, including calling the caregiver directly.[38]  Plaintiff was allowed to write a rebuttal letter that was given to Shields and Conifer.  Conifer informed

---

[36] The Court overrules Defendant's objection that this is hearsay.  Plaintiff testified that Defendant's human resources representative told her about such a file.  This is a statement of a party opponent.  Fed. R. Evid. 801(d)(2)(D). The evidence does not support Plaintiff's assertion that Defendant maintained a personnel file.  The evidence provided by Plaintiff only shows that this file contained the signed acknowledgements from orientation, but nothing else.  The testimony of Clark only provides that Harris told her that any write ups made by St. Francis could be placed in "whatever St. Francis had on [them]," but Harris did not state that there was in fact such a file or Harris had personal knowledge of such a file.  The Court is unwilling to find such a file existed based on speculation.

[37] The Court overrules Defendant's objection that the write up violates the best evidence rule because the testimony is not referring to the contents of the document, but rather the existence of the document.  See Fed. R. Evid. 1002 advisory committee notes ("Thus an event may be proved by nondocumentary evidence, even though a written record of it was made.").  The Court also overrules Defendant's objection that Plaintiff testified that she was never confronted by Shields following the incident.  The existence of the alleged write up is not controverted by this assertion.  When viewing the evidence in the light most favorable to Plaintiff, it is possible that Clark was shown this write up even though Plaintiff was not.  However, the Court denies Plaintiff's assertion that this write up was a disciplinary form as the evidence provided does not support that it was a disciplinary form.

[38] Plaintiff did not provide any evidence that St. Francis investigated the matter beyond what was done by Conifer.

Defendant that it found the complaint was meritless.  Shields wanted to reprimand Plaintiff, but Plaintiff was not disciplined.

Also, Shields filed a complaint against Plaintiff for an alleged violation of HIPPA with the St. Francis Compliance Officer.  However, all individuals who work at the hospital (whether employee or contractor) had an obligation to comply with HIPPA.  HIPPA compliance was not a human resources policy.

When a complaint was made about Clark regarding a confrontation in Defendant's human resources office, Conifer investigated and addressed the issue.  Shields may have written up or did write up Clark concerning the incident. [39]  Harris told Clark that she could not prevent Shields from placing the write up in whatever file Defendant maintained on Clark.  Harris, however, refused to discipline Clark for the incident.

Plaintiff complained of racial discrimination while on site.  Plaintiff complained of racial discrimination by Judy Osbourne, a social worker for Defendant, to Mary Clare, Defendant's Director of Risk Management.  On several occasions, Judy Osbourne told Clark and Plaintiff that "you black girls are out of here" and wished them well in finding new employment. [40]  Clark complained to Shields about racial discrimination.  Plaintiff repeatedly complained to Kelim about the alleged discrimination.  Plaintiff complained to Conifer at least three times per week during her entire assignment at Defendant.

---

[39] Again, the Court overrules the objection to the reference to the write up as a violation of the best evidence rule because this refers to the existence of the write up, not the content.  The Court also overrules Defendant's objection that this is hearsay.  Clark testified that she heard about the write up from Harris who received the document in question.  Although Clark's testimony would be hearsay, Harris could testify to the document without necessitating hearsay.

[40] Defendant's objection to hearsay is overruled as this is a statement of a party opponent.  Fed. R. Evid. 801(d)(2).  Ms. Osbourne was a social worker for Defendant, and she made the statement within the scope of her employment.  Fed. R. Evid. 801(d)(2)(D) ("The statement is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").

Around March 2014, Conifer's human resources department learned of the complaints Plaintiff had made about Defendant's work environment.  Halima Redding, a Conifer human resources employee, visited St. Francis in March or April 2014 to observe the environment. Redding attended a meeting with Plaintiff and Defendant's hospital personnel, but she told Defendant's staff that she was an associate in training.  Stephen Saffa, St. Francis's Director of Human Resources, was unaware that Redding was at St. Francis observing when she visited. Conifer began discussing internally removing Plaintiff from her placement at Defendant at least by May 21, 2014.[41]

Conifer did not inform Defendant about Plaintiff's complaints to Conifer until early June 2014.  Redding called Saffa and reported Plaintiff's complaints.  In June 2014, Redding returned to Defendant's facility to meet with Saffa to interview with Plaintiff and Clark.  Clark testified that during a meeting with Saffa she reported some of the discriminatory incidents she had experienced to which Saffa stated "I don't believe that."  However, Saffa stated he was going to conduct interviews.  Saffa disciplined one of Defendant's employees based on Plaintiff and Clark's allegations of racial discrimination.

Conifer decided to remove Plaintiff and Clark during the middle of June.  Conifer worked with Plaintiff to find her a new position outside of Defendant.  On July 21, 2014, counsel for St. Francis sent a letter to Redding at Conifer regarding Plaintiff and Clark.  This letter found the complaints of discrimination were unsubstantiated given the evidence available.  The letter requested further evidence from Conifer.  On July 31, 2014, Conifer removed Plaintiff and Clark from St. Francis, and Plaintiff and Clark turned in their badges to Defendant's human resources.

---

[41] Plaintiff did not properly controvert this fact.  Defendant offered an email from Redding on May 21, 2014, that recommended "[a]lternative internal employment opportunities."  Plaintiff offered an email to controvert the fact that Redding discussed removing Plaintiff from St. Francis.  However, this email was earlier in time (March 24, 2014) and simply omitted the alternative employment opportunities as a recommendation.

Defendant was not aware that Conifer was removing Plaintiff and Clark until the badges were turned in.[42]

Conifer was aware that Plaintiff had been applying for several other positions within Conifer (and outside of Defendant or Topeka) since 2013 with no success. Conifer did not have another patient advocate position to offer Plaintiff. Plaintiff accepted an accounts receivable collections position on September 2, 2014, and she is still employed in that position with Conifer.

SCLHS and Conifer entered into a Termination and Release Agreement ("Termination Agreement") that became effective on September 10, 2014.[43] The Termination Agreement ended Conifer's services at Defendant.[44] The Termination Agreement released all claims between themselves, their subsidiaries, and their employees, and states, in pertinent parts:

> Effective upon the Termination Effective Date and except for Client's payment obligation set forth in Section 2 above, Conifer does hereby unconditionally, fully and completely release, acquit and forever discharge Client and its successors, assigns, employees, agents, representatives, attorneys, and other related entities or persons (collectively, the "Client Released Parties") from any and all claims, demands, actions, causes of action, suits, debts, compensation, bonus, commissions, accounts, notes, covenants, contracts, agreements, promises, liabilities, damages, losses, costs and expenses whatsoever (collectively "Claims"), known or unknown, accrued or unaccrued, in law or in equity, which Conifer, its subsidiaries, or their respective employees, agents, or subcontractors have or may have by reason of any acts, events, or omissions occurring at any time up to the Termination Effective Date relating in any way to the Services provided by Conifer for St. Francis.

---

[42] Plaintiff offered no evidence to contradict the fact that Defendant was unaware that Plaintiff and Clark were being removed until the moment that they turned in their badges.

[43] The Court sustains Defendant's objection to Plaintiff's assertion that St. Francis had the power to terminate the MSA with Conifer thereby terminating Plaintiff and Clark's position at St. Francis. This was unsupported by the record. There is nothing to suggest the MSA, which governed the placement of Conifer's contractors at St. Francis, gave SCLHS's constituent hospitals the power to terminate the MSA.

[44] The Court does not include in the uncontroverted facts that Plaintiff knew the contract was being terminated prior to leaving. Clark's deposition testimony indicates that neither Kelim nor Redding knew whether the contract was being terminated when she asked. Also, there is no indication that Judy Osbourne had any personal knowledge on whether the contract was being terminated. This is merely speculation, which is improper for summary judgment.

### C.      Discussion

### 1.      Termination Agreement

The first issue addressed in Defendant's motion for summary judgment is whether the Termination Agreement released the claims Plaintiff asserts in this case.[45]  Defendant relies on language in the agreement stating "Conifer . . . fully and completely release[s] Client . . . from any and all claims . . . which Conifer, its subsidiaries, or their respective employees . . . have or may have by reason of any acts, events, or omissions occurring at any time up to the Termination Effective Date relating in any way to the Services provided by Conifer for St. Francis." Defendant argues that by virtue of the fact that Plaintiff is a Conifer employee, her claims against Defendant are released.

While the parties argue about the import and effect of the Termination Agreement, whether it is merely a hold harmless agreement, and whether it forecloses actions by an employee of a third-party contractor that is a party to the agreement, that is not germane to the issue.  For, irrespective of the alleged scope of this agreement, Title VII and § 1981 claims may only be waived by agreement with the injured party.[46]  When the issue of waiver comes up, it is normally in the employer-employee context.[47]  An employee may waive potential claims under civil rights statutes, so long as the waiver is made knowingly and voluntarily.[48]  However,

---

[45] Plaintiff contends the Court should disregard this argument because Defendant presented it without legal support, which is prohibited at summary judgment.  But Defendant did cite legal support in its reply.

[46] *Pittman v. American Airlines, Inc.*, No-14-0728, 2015 WL 2354439 (N.D. Okla. 2015) (quoting *Torrez v. Pub. Serv. Co. of N.M., Inc.*, 908 F.2d 687, 689 (10th Cir. 1990)) ("The Tenth Circuit has held that '[b]oth Title VII and section 1981 employment discrimination claims may be waived by agreement, but the waiver of such claims must be knowing and voluntary.'").

[47] *But see Vesom v. Atchison Hosp. Ass'n*, No. 04-2218, 2006 WL 2714265, at *14, 27–28 (D. Kan. Sept. 22, 2006) (analyzing the issue of waiver between an independent contractor and a hospital).

[48] *Torrez*, 908 F. 2d at 689.  *See also Stafford v. Crane*, 382 F.3d 1175, 1180 (10th Cir.2004); *Reed v. Nellcor Puritan Bennett*, 244 F. Supp. 2d 1205, 1210–12 (D. Kan. 2003).

"[w]aivers of federal remedial rights [], are not lightly to be inferred."[49]  To determine if a waiver is knowing and voluntary, courts look beyond the contract language at the following factors:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether [p]laintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.[50]

While the Termination Agreement may have been knowingly and voluntarily entered into by Conifer and SCLHS, there is no indication that Plaintiff knowingly and voluntarily released her claims.  There is no indication that Conifer had authority to enter into such a contract on Plaintiff's behalf.  There is no evidence offered that Plaintiff knew that such an agreement was entered into between Conifer and SCLHS because she had already left St. Francis when it was signed on September 10, 2014.  The Court concludes that the Termination Agreement did not release these claims.  Therefore, summary judgment is not properly granted on this ground.

### 2.    Joint Employers

The Court next addresses whether Defendant is Plaintiff's joint employer for purposes of Title VII and § 1981.[51]  To establish a prima facie case under Title VII and § 1981, a plaintiff must first prove the defendant was her employer.[52]  Depending on the situation, the Tenth Circuit

---

[49] *Torrez,* 908 F.2d at 689.

[50] *Id.* at 689–90.

[51] Plaintiff's argument that this issue can only be resolved by a jury is unavailing.  This, like all other issues in this case, can be resolved upon a properly supported summary judgment motion.

[52] *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1069 (10th Cir. 1998); *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1361 (10th Cir. 1993).  *See also Knitter v. Corvias Military Living, LLC,* 758 F.3d 1214, 1225 (10th Cir. 2014).

has approved various tests to determine whether a defendant is an employer for the purposes of Title VII and § 1981.[53]   The Tenth Circuit has ruled that the joint employer test is proper where "an employee of one entity seeks to hold another entity liable as an employer."[54]   In other words, "a plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are joint employers.  This joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment."[55]   "Both entities are employers if they both 'exercise significant control over the same employees.'"[56]   This Court has already ruled that the joint employer test is the proper test to employ in this case.[57]

When assessing whether two entities are joint employers, courts weigh several factors to determine whether a company controls the terms and conditions of an employment relationship. These factors include whether the company has the ability to: (1) terminate the employee; (2) promulgate work rules and issue assignments; (3) set conditions of employment, including compensation, benefits, and hours; (4) supervise and discipline the employee; and (5) control the employee's records, including payroll, insurance, taxes and other records.[58]   The Court analyzes the factors outlined by the Tenth Circuit in turn.

---

[53] *Knitter*, 758 F.3d at 1225.

[54] *Id.* at 1226.

[55] *Bristol v. Bd. of Cnty. Comm'rs of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc).

[56] *Knitter*, 758 F.3d at 1226 (quoting *Bristol*, 312 F.3d at 1218).

[57] *See* Doc. 96 at 5–6 ("Rather, the facts alleged in this case fall squarely into the context of the joint employer test, and that is the correct test here.").

[58] *Knitter*, 758 F.3d at 1226.

### a.    Ability to Terminate Plaintiff

"Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances."[59]  The Tenth Circuit has considered under this factor both whether the alleged joint employer had impact on the hiring decision and had the ability to terminate.[60]

Plaintiff argues that St. Francis had the ability to terminate Plaintiff by refusing to provide a reasonable work environment pursuant to the MSA.  By refusing to address Plaintiff's complaints of discrimination, Plaintiff argues that Defendant effectively created in itself the authority to terminate Plaintiff.  First, Plaintiff argues that Defendant knew that the patient advocate position was Plaintiff's only job.  Second, because Defendant knew this was her only job and refused to take corrective action to stop the discrimination, Defendant effectively terminated Plaintiff's employment.  Plaintiff contends that a "reasonable jury can find that the Termination Agreement was caused and requested by St. Francis to get rid of the African-American patient advocates that would not stand for racial name-calling, harassment and blatant discrimination."  Defendant, however, argues that Conifer hired Plaintiff.  Conifer had the explicit authority to terminate Plaintiff's employment.  Plaintiff has not been terminated, and Conifer worked with her to change positions.  Further, Defendant argues that even if the record reflected that Defendant could ask that she be moved from her placement, this is not equivalent to the ability to terminate.[61]

---

[59] *Bristol*, 312 F.3d at 1219.  *See also Knitter*, 758 F.3d at 1228.

[60] *Sandavol v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004).

[61] *See Zinn v. McKune*, 143 F.3d 1353, 1358 (10th Cir. 1998) ("Though the Department retains the right to request removal of PHS personnel with whom it is dissatisfied, and did so in this case, PHS alone exercises control over the hiring and firing of PHS personnel."); *Palage v. HCA-HealthONE, LLC*, No. 11-CV-01285-LTB-CBS, 2012 WL 5493998, at * 6 (D. Colo. Nov. 13, 2012) ("Although HealthONE did have the contracutal ability to request the re-assignment of an HSS employee assigned to its facilities, this does not equate to either hiring or firing those HSS employees.").

The Court disagrees with Plaintiff's theory that the power to terminate should be imputed to Defendant. The evidence does not support the argument that Defendant knew the patient advocate position was the only position available to Plaintiff. Instead, the record reflects that Defendant was unaware that Plaintiff had been applying for other positions, but Plaintiff had been applying for positions within Conifer starting in 2013. There is nothing in the record to show Defendant knew or should have known this was Plaintiff's only possible job. Even assuming Defendant believed this was Plaintiff's only position, the evidence shows this was not the case. In fact, after leaving Defendant on July 31, 2014, Plaintiff started a new job within Conifer on September 2, 2014, and Conifer still employs her. While Plaintiff offers that Judy Osbourne told Plaintiff on several occasion that she was "out of here" and wished her well in finding new employment, this does not suggest Defendant had knowledge that this was Plaintiff's only possible job. Therefore, there is no evidence Defendant knew the patient advocate position was Plaintiff's only possible employment.

Even assuming Defendant knew that this was Plaintiff's only job, the Court disagrees that Defendant refused to take corrective action thereby effectively exercising its right to terminate the MSA.[62] Plaintiff alleges that she complained to Clare, and Clark testified she complained to Shields multiple times a week about discrimination, which does indicate a refusal to take corrective measures. However, when Saffa in Defendant's human resources department was made aware of the incidents, the record shows he met with Redding, Clark, and Plaintiff. Although Saffa said "he didn't believe" Clark, Saffa also agreed to speak with the employees involved. There is also evidence that Saffa did discipline one employee based on the allegations. Also, Saffa and defense counsel after sending a denial letter requested further evidence to

---

[62] The Court has already ruled above that Defendant did not have the power to terminate the MSA. *See supra* note 43. The Termination Agreement was between SCLHS and Conifer.

investigate from Redding, but there was no reply.  There is no indication that there was a refusal to take corrective measures.  Moreover, the evidence does not show that the Termination Agreement was used to terminate Plaintiff and Clark; the agreement was not signed and effective until September 10, 2014, more than a month after Plaintiff and Clark left.

Further, Plaintiff offers no case law supporting her argument that the right to terminate should be imputed to Defendant because Defendant knew that Plaintiff had no other job opportunities and Defendant refused to create a reasonable work environment.  Without any case law to support this theory of imputation, the Court declines to recognize it here for the first time.

The Court recognizes that it was Conifer who posted the job requisition, conducted the interview, and hired Plaintiff through the offer letter sent in December 2011.  There is no evidence in the record that Defendant had any say in the hiring process.  Moreover, Conifer maintained the right to terminate the employment as explicitly stated in Plaintiff's offer letter. Yet Conifer did not terminate Plaintiff; and Defendant did not terminate Plaintiff.  There is no indication in the record that Defendant requested Plaintiff be fired other than an alleged comment by Judy Osbourne, who did not have the power to hire or fire Plaintiff, that Plaintiff was "out of here."  The classic indicators of Defendant's power to terminate are all missing from this case.

Plaintiff's reliance on a Fifth Circuit case, *Burton v. Freescale Semiconductor*,[63] is misplaced.  In *Burton*, the court determined whether Freescale was the plaintiff's employer for purposes of the Americans with Disabilities Act under the economic realities/common law control test.[64]  The court held that Freescale met that test because it had the right to terminate the

---

[63] 798 F.3d 222 (5th Cir. 2015).

[64] *Id.* at 227.

plaintiff and in fact made the decision to fire the plaintiff.[65]  Freescale also had supervisory power, completed performance reviews, and delivered on-the-job corrections and admonishments to the plaintiff.[66]

Here, Defendant lacked the power that the Fifth Circuit noted was "most fundamental"[67] to its decision in *Burton*—the power to fire.  There is no evidence that Defendant did request or could request that Conifer fire Plaintiff.  Nor is there evidence that Defendant had the ability to supply supporting documentation should it want to request Conifer fire Plaintiff.  Moreover, the Court notes that there is no evidence that Defendant's staff made complaints against Plaintiff.

The Court finds analogous a Tenth Circuit case that Defendant cites to, *Knitter v. Corvias Military Living, LLC*.[68]  In *Knitter*, the plaintiff was a handyman employed by a general contractor and assigned to work for the general contractor's largest client, a property management company.  To decide whether there was a joint employment relationship, the Tenth Circuit looked to whether the property management company had the authority to terminate plaintiff's employment.[69]  Knitter argued that the property management company, which was one of the general contractor's only clients, could effectively fire her by requesting she no longer work on its project.[70]  The Tenth Circuit rejected this argument because there was no evidence that the property manager knew it was one of the general contractor's only clients.  And, the property management company "lacked the power to fire Ms. Knitter; it at most could request

---

[65] *Id.* (noting that while Manpower ultimately fired Burton, Freescale requested the termination, supplied supporting documents, and meticulously catalogued Burton's shortcomings).

[66] *Id.*

[67] *Id.*

[68] 758 F.3d 1214 (10th Cir. 2014).

[69] *Id.* at 1228–29.

[70] *Id.*

that [the general contractor] no longer assign Ms. Knitter to work."[71]  Thus, the court held that the contractor had the ability to terminate her employment, not the property management company.[72]

The Court finds that this case is similar to the *Knitter* case.  Although the Court finds that Conifer had other work available for Plaintiff, which is evidenced by the fact that she applied for jobs within Conifer for years and she got a new job with Conifer within a month of leaving Defendant, this case is similar to *Knitter* in that Defendant had no power to terminate Plaintiff. While the defendant in *Knitter* requested that the plaintiff be removed from the project, there is no evidence that Defendant did request or could request that Plaintiff no longer work at St. Francis.  Defendant was unaware that Plaintiff had been applying for other positions within Conifer, and there is no evidence that Defendant knew or should have known that Plaintiff could not get a job outside of the patient advocate position.  In fact, Plaintiff did get a new position with Conifer, and she is still employed by Conifer.  Like in *Knitter*, there is no evidence that Defendant could terminate Plaintiff or even ask that Plaintiff be terminated.

Accordingly, the ability to terminate Plaintiff, which is the most important factor, weighs heavily in favor of Defendant.

**b.      Right to Promulgate Work Rules and Issue Assignments**

Plaintiff argues that this factor weighs in favor of finding joint employment because (1) she wore a Defendant-provided name badge, (2) she was provided training that went beyond the requirements of the MSA, (3) she was required to follow hospital rules, and (4) Shields provided her with work assignments that went beyond the patient advocate duties.

---

[71] *Id.* at 1229.

[72] *Id.*

Even where the plaintiff is required to wear a provided badge or uniform, this consideration is not sufficient standing alone to prove a joint employment relationship.[73]  Given the safety concerns in hospitals, requiring Plaintiff to wear a badge does not go beyond the average vendor-client relationship.  Furthermore, Plaintiff's badge was a different color than a Defendant employee badge, distinguishing contractor provided employees from Defendant's employees.  The Court agrees with Defendant that this is significant because although Defendant required Plaintiff to wear a badge it issued, the badge was a different color than an employee badge.  This does not weigh in favor of joint employment.

But, as Plaintiff posits, Defendant also provided training beyond that typically provided within a vendor-client relationship.  Defendant not only provided orientation and systems training required by the MSA, Defendant also provided training on patient accounts, diversity, and regularly scheduled patient access training.  This went beyond the requirements of the MSA.

Further, although Defendant required Plaintiff and Clark to comply with certain hospital rules, Conifer promulgated their work rules, and Conifer's human resources policy governed Clark and Plaintiff.  Also, Conifer's holiday schedule governed time off.  Conifer received all reported absences, and passed the information to Defendant.  Furthermore, Conifer determined whether Clark and Plaintiff attended meetings.

Moreover, the hospital rules Defendant required Plaintiff to comply with did not go beyond the typical vendor-client relationship and the requirements of the MSA.  Pursuant to the MSA, Conifer employees were required to follow Defendant's personnel and administrative policies and procedures and code of conduct.  Conifer was required to familiarize its employees

---

[73] *See Wigfall v. St. Leo Univ., Inc.*, No. 8:10-CV-02232-T-24, 2012 WL 717868, at *7 (M.D. Fla. Mar. 6, 2012) ("To the extent that Plaintiffs contend that Saint Leo was a joint employer because they were required to wear a uniform and an ID badge that identified them as Saint Leo 'employees,' such evidence is insufficient to establish that Saint Leo was a joint employer.").

with Defendant's policies under the MSA.  The fact that Plaintiff was required to email Conifer and Shields when she went to visit patients off site was likely a policy that Plaintiff was required to follow pursuant to the MSA.  Arguably, this was a way for Shields to ensure someone was on site to provide the MECS role.  The fact that Plaintiff had to approve time off with Conifer and Defendant was also a way to ensure that Defendant was not left without someone providing the MECS role during business hours.  When Plaintiff was required to work extra hours, this was approved by Conifer to keep Defendant pleased with Conifer's service.  And the fact that Plaintiff was required to wear business casual dress in accordance with Defendant's policy was likely to ensure that vendors who had contact with patients dressed professionally.  Further, the fact that Plaintiff had to announce she was a patient advocate for Defendant does not affect the analysis as this merely ensured that patients were comfortable with the Conifer employees when they entered their rooms.  The rules Plaintiff sets out as showing a joint employment relationship fall squarely within the work rules one would expect of the typical vendor-client relationship.

Plaintiff also argues that all work assignments, including assignments that went beyond her job duties, were promulgated by Shields.  To be sure, Defendant provided Plaintiff a patient census with the patients to see that day.  But this was designed to ensure that Plaintiff could fulfill the obligations under the MSA.  Defendant (through Shields) also required Plaintiff and Clark to provide services outside of the patient advocate role, including working in the emergency room, working on COBRA accounts, and working on government benefit applications for Shields' brother.  But these expansions of Plaintiff and Clark's work assignments were all approved by Conifer.  This weighs against finding a joint employment relationship.

Thus, although there was arguably training that went beyond the requirements of the MSA, the Court concludes that the work rules, work assignments, and the requirement that Plaintiff wear a hospital-issued badge do not go beyond what would be expected of a vendor-client relationship.  This factor weighs against the finding of a joint employment relationship.

### c.      Power to Set Conditions of Employment

Although the ability to terminate an employee is the most important factor, the court must also consider whether the alleged joint employer had control over the plaintiff's "records, including payroll, insurance, taxes, and the like."[74]  Plaintiff argues that despite Conifer's control of many of the terms of employment, Defendant (through Barb Shields) unilaterally changed many of the terms and conditions, including the number hours, the holiday schedule, and the duties of the patient advocate role.

To be sure, Defendant (through Barb Shields) changed a number of the terms and conditions of Plaintiff's patient advocate position, including: completing tasks that were not within the patient advocate duty, working extra hours, working in the emergency room, working on COBRA accounts, and working on government benefit applications for Shields' brother.  But, Shields' requests were first approved by Conifer.  Plaintiff and Clark asked Conifer whether they should work after hours per Shields' request, and Conifer instructed that they should.  Conifer approved of Plaintiff or Clark working on Conifer holidays.  It was Harris and Shields who made the decision that Plaintiff would work in the emergency room.  Kelim agreed that Clark could work on COBRA accounts and on benefits applications for Shield's brother, as Shields requested.  As Kelim told Plaintiff, St. Francis was the client, and Plaintiff and Clark needed to do what was necessary to appease the client.  This indicates a business relationship

---

[74] *Knitter*, 758 F.3d at 1229 (quoting *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007)).

rather than an employment relationship, as there is no indication that Shields was changing the terms of employment without consultation with Conifer.

Furthermore, it is uncontroverted that Conifer set Plaintiff's pay rate, not Defendant. Conifer paid Plaintiff's compensation and her employment taxes. Conifer provided Plaintiff's benefits, including medical, dental, and vision insurance as well as Education Assistance Reimbursement. Conifer set the hours for Plaintiff's position as full-time in the requisition.[75] The only alleged benefit provided by Defendant was that Plaintiff could use her photo identification badge in Defendant's cafeteria. This is hardly the type of "benefit" indicating an employment relationship.

Moreover, although Defendant maintained a file on Plaintiff, at most it contained signed acknowledgement forms concerning Plaintiff's orientation training. Clark's testimony regarding Harris stating that she could not keep St. Francis from putting write ups in "whatever St. Francis had on [them]" does not evidence that Harris had personal knowledge that Defendant kept such personnel files. In fact, Plaintiff and Clark both testified that they did not know about a personnel file beyond the file containing some signed acknowledgements. And while there is evidence that Clark and Plaintiff were written up, there is no evidence showing where the write ups went. Based on the evidence, the Court finds that while Defendant did keep a file on Plaintiff and Clark, there is no indication this was a personnel file in the traditional sense.

Plaintiff again argues that Defendant provided training that went beyond what was required by the MSA. As addressed above, the Court concludes that most of the training comported with expectations under the MSA, including access and training on appropriate systems. However, some of the training went beyond the bounds of the MSA, including training

---

[75] Plaintiff argues that there is no evidence that she saw the requisition. However, the fact that she may or may not have seen the requisition does not change the fact that it set the position as full time.

on documenting patient accounts, regular patient access training and diversity training.  While the training on documenting patient accounts may have been necessary for Plaintiff and Clark to perform the MECS role pursuant to the MSA, the diversity training and patient access training were beyond the bounds of the MSA or performance criteria under the MSA.  To be sure, some formal training and on-the-job training does not necessarily make a person an employee.[76]  But the evidence weighs in favor of finding Defendant is a joint employer, although the training alone will not suffice.

Plaintiff further argues that Defendant supplied her everything to provide patient advocate services, including office space, a desktop, all of her supplies, a phone, a copier, and an email account.  But Defendant was obligated under the MSA to provide Conifer employees with "a reasonable work environment, including reasonable office space, furniture, supplies, and equipment . . . to enable Conifer to perform its obligations."  The fact that Plaintiff and Clark worked on site tends to show joint employment.  But Plaintiff and Clark would not have been able to fulfill the obligations of the MSA without working on site and having an office space, which is likely why it was negotiated as part of the MSA.  Thus, the requirement that Defendant supply them with office space, a desktop computer, a phone, an email account, and supplies pursuant to the MSA enabled Plaintiff and Clark to provide the MECS role, and it does not tend to show joint employment.

Overall, while the training provided by Defendant arguably went beyond what was contractually required pursuant to the MSA, this is the only fact tending to show Defendant had any control over the terms and conditions of Plaintiff's assignment at St. Francis.  The evidence shows Conifer controlled Plaintiff's pay, hours, and benefits.  Any changes to the patient

---

[76] *Knitter*, 758 F.3d at 1220 ("Neither Mr. Lewis nor Picerne provided Ms. Knitter with any additional formal training, although Picerne employees would occasionally demonstrate to the Knitters 'how [Picerne] wanted things done,' including how to repair binding doors or other specific tasks.").

advocate duties proscribed by Shields were approved through Conifer. Conifer maintained

Plaintiff's personnel file, and Defendant, at most, had a file containing signed acknowledgements

of various policies. Any Defendant-provided office space, equipment, or supplies were

contractually required pursuant to the MSA. This factor weighs against the finding of a joint

employment relationship.

### d. Supervisory and Disciplinary Role

This factor requires the court to consider "day-to-day supervision of employees,

including employee discipline."[77] Some degree of supervision and even discipline is to be

expected when a vendor's employee comes on another business's work site.[78] Supervision that is

limited and focuses on workplace safety issues typically will not be considered the type of

supervision indicating joint employers.[79] Courts should consider whether supervision extended

to such matters as training or formal performance evaluations provided to employees.[80]

Defendant argues that it did not supervise Plaintiff beyond that required in the average

vendor-customer relationship, comparing the scope of its supervision to that in *Knitter*, where the

Tenth Circuit found no joint employment relationship. The property manager in *Knitter*

determined what work needed to be done,[81] provided assignments and instructions about the

work,[82] demonstrated specific tasks to the plaintiff,[83] and contacted Knitter or the general

---

[77] *Id.* at 1229 (quoting *Butterbaugh*, 479 F. Supp. 2d at 491).

[78] *Id.* at 1230.

[79] *Id.*

[80] *Id.*; *Hurde v. Jobs Plus–Med*, 299 F .Supp. 2d 1196, 1209 (D. Kan. 2004).

[81] *Knitter*, 758 F.3d at 1219 (alleging that the property manager's maintenance supervisor determined "what work needs to be done").

[82] *Id.* at 1220 (alleging Knitter received assignments directly from the property manager's maintenance supervisor).

[83] *Id.* at 1220–21 (determining the property manager's supervisors would "occasionally show[] the Knitters how they wanted specific tasks performed).

contractor to rectify any issues with her performance.[84]  This, the Tenth Circuit found, meant that "[the property manager] exerted the sort of control over [the general contractor's] handymen that one would expect a client to exert over its vendors- supervising limited aspects of their work, providing them with instruction on particular tasks, and furnishing them with supplies when necessary."[85]

The Court agrees with Plaintiff that Shields' supervisory role went beyond that discussed in *Knitter*. While the property manager in *Knitter* had no supervisor for the plaintiff, Shields was on site and told Plaintiff and Clark she was their supervisor.  Shields provided a daily census to Plaintiff and Clark with assigned patients to visit.  She provided at least some training on how to document patient accounts, and she regularly provided patient access training.  Conifer had supervisors on site once every two to three months.  Shields' role went beyond simple direction on limited tasks, and she seemingly worked somewhat closely with the two Conifer employees. She ordered supplies for Plaintiff.  She sometimes extended the duties of the patient advocate role.  She held meetings Plaintiff attended.  She required Plaintiff go through her before discussing anything with other hospital staff.

On the other hand, many fact counsel against finding that Defendant had supervisory power akin to an employment relationship.  Although Conifer did not have a supervisor on site, the record reflects that Plaintiff and Clark were in close contact with Kelim and Harris regarding questions about procedures, scope of services, absences, and even interaction with Defendant's staff, including Shields.  Plaintiff or Clark consulted Conifer for approval of Shields' requests or directions, including those pertaining to tasks outside of the patient advocate role.  Moreover, the requisition itself stated that the patient advocate position reported to Kelim, not Defendant or

---

[84] *Id.* at 1221.

[85] *Id.* at 1231.

Shields.  When Shields demanded that Plaintiff and Clark attend weekly meetings, Kelim refused Shield's demand.  Defendant also refused Shields' request that Plaintiff be reprimanded when a patient's caregiver lodged a complaint.

Furthermore, the Tenth Circuit considers whether the alleged joint employer performed performance evaluations when deciding supervisory power.[86]  It is uncontroverted that Conifer, not Defendant, performed annual performance evaluations on Plaintiff.  While Defendant performed quarterly appraisals, these appraisals were not specific to Plaintiff's or Clark's performance.  Rather, Defendant recorded general statistics about the Conifer employees' performance.  This is not the type of performance evaluation that lends itself to supervisory authority.

The Court must also consider the amount of disciplinary power Defendant had with respect to Clark and Plaintiff.   Clark saw a write up of Plaintiff stemming from the complaint by a patient's caregiver.  Shields wrote up Clark for the incident in the human resource office.  And, Harris told Clark she could not control what information Defendant maintained on her in whatever file it may have.

But the Court finds that Defendant had a limited disciplinary role that did not go beyond a typical vendor-client relationship.[87]  Although Shields wrote up a summary of the events surrounding a complaint made by a patient's caregiver against Plaintiff, there is no evidence where this summary of the incident went or what it was used for, and it is unclear from the record if this was used by Conifer.  And, although Defendant wrote up Clark for an incident in the human resources office, there is no evidence where this write up went or what it was used

---

[86] *See Zinn v. McKune*, 143 F.3d 1353, 1358 (10th Cir. 1998).

[87] *Knitter*, 758 F.3d at 1221 (noting the general contractor could fine plaintiff for violation of its rules regarding safety equipment, but ultimately, the court concluded this was not sufficient to prove joint employment).

for.  Further, Defendant filed a violation of HIPPA against Plaintiff with its compliance officer; but HIPPA compliance, under federal law, is something every contractor with the hospital had to comply with.  It is not a type of discipline particular to hospital employees.

Moreover, two of these three incidents were reported to Conifer, and Conifer investigated them.  Shields never confronted Plaintiff about the patient caregiver's complaint, but passed the complaint to Conifer.  Conifer investigated the matter and refused to discipline Plaintiff over Shields' demand for her to be reprimanded.  And Conifer was made aware of the incident involving Clark, and declined to discipline Clark.  Although there is evidence that Defendant had some disciplinary power in the form of write ups, any incidents that happened with the Conifer employees always flowed through Conifer for the ultimate disciplinary decision.  Defendant had a limited disciplinary role, which weighs against a finding that Defendant was Plaintiff's joint employer.

Further, while Plaintiff complained to both Defendant and Conifer about discriminatory behavior, complaints made by Plaintiff always flowed through Conifer, which tends to weigh against finding it as a joint employer.  Of course, there is evidence that Clark complained to Shields about race discrimination, and Plaintiff complained to Mary Clare about Judy Osbourne. But the fact that Plaintiff and Clark complained to Defendant about the discriminatory behavior of Defendant's employees does not weigh toward finding a joint employment relationship.  As Plaintiff and Clark were on-site and dealt with Defendant's employees, it would make sense that they would complain to Defendant's supervisors about its staff.  Defendant had the power to discipline its employees, so Plaintiff and Clark may have believed this was the most direct way to solve the issue.  Moreover, Plaintiff and Clark complained to Kelim at Conifer several times a week about the behavior of Defendant's employees.  They did not complain to Defendant's

employees with nearly as much frequency.  Thus, Plaintiff and Clark's complaints to

Defendant's staff about its employees do not weigh in favor of finding a joint employment

relationship.

In conclusion, although Defendant did have some supervisory power over Plaintiff and

Clark through Shields, this factor does not weigh heavily toward finding a joint employment

relationship because Defendant did not conduct performance evaluations, Defendant had a

limited disciplinary role, and complaints made by Plaintiff and Clark were handled almost

exclusively through Conifer.

### e.    Control Over Employee Records

As analyzed in this Court's discussion of Defendant's ability to set Plaintiff's condition

of employment, the evidence shows that Conifer maintained Plaintiff's personnel file.  The

record reflects that while Defendant did have a file for Plaintiff and Clark, the file contained

signed acknowledgments from Defendant's orientation.  There is no evidence that the alleged

write ups of Clark or Plaintiff went in such a file because the evidence offered was mere

speculation by Harris at Conifer, which is insufficient.  Thus, this factor weighs in favor of

finding no joint employer relationship.

### 3.    Conclusion

Plaintiff did not release her claims under the Termination Agreement, so summary

judgment is not proper on this ground.  Furthermore, there is no joint employer relationship

between Defendant and Plaintiff, so summary judgment is properly granted on this ground.  The

most important factor—the ability to terminate—was solely in the hands of Conifer, and this

factor leans heavily against finding a joint employment relationship.  Defendant had some

control over work rules and assignments, but it did not go beyond that of the typical vendor-

client relationship.  While Defendant provided some training beyond what was contractually required under the MSA, Defendant had little power over the terms and conditions of Plaintiff's employment, including pay, hours, duties, and benefits.  There was no evidence that Defendant maintained a personnel file or records on Plaintiff.  And, although Defendant asserted some supervisory power over Plaintiff and Clark, Defendant did not complete performance evaluations on Plaintiff and had little to no disciplinary power over Plaintiff.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's first Motion to Dismiss (Doc. 120) is **moot** and Defendant's second Motion to Dismiss (Doc. 130) is **denied**. Defendant's Motion for Summary Judgment (Doc. 127) is **granted**.

**IT IS SO ORDERED.**

Dated: November 21, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE